780 N.W.2d 39 (2010)
18 Neb. App. 276
In re Interest of CHRISTIAN L., a child under 18 years of age.
State of Nebraska, appellee,
v.
Peggy L., appellant.
No. A-09-670.
Court of Appeals of Nebraska.
February 16, 2010.
*40 Julie A. Frank, of Frank & Gryva, P.C., L.L.O., Omaha, for appellant.
Donald W. Kleine, Douglas County Attorney, and Paulette Merrell for appellee.
Regina T. Makaitis, guardian ad litem for appellant.
IRWIN, SIEVERS, and CARLSON, Judges.
IRWIN, Judge.

I. INTRODUCTION
Peggy L. is appealing the order adjudicating her minor child, Christian L., to be a child within the jurisdiction of the juvenile court. The State's petition alleged specifically that Christian lacked proper parental care through the fault or habits of Peggy and that Christian was at risk of harm. The only factual grounds necessitating adjudication, as stated in the petition, were that the home was in a "filthy, unwholesome condition" and that the home "did not contain enough food" for Christian. There was no mention in the petition of Peggy's mental health.
Peggy argues that her due process rights were violated when the juvenile court adjudicated Christian based on substantial evidence and testimony concerning her mental health, an issue not raised by the operative petition. The State's position on appeal is that given the above allegation in the petition, "[Peggy] had sufficient notice that her mental health was a potential issue at the adjudication since it was a possible cause for the dirty home and it potentially placed Christian at risk for harm." Brief for appellee at 13.
*41 We conclude that the State made Peggy's mental health status a focus of its attempt to prove the allegation that Christian was at risk and lacked proper parental care through the fault of Peggy. The allegations of the petition, however, concerned only the condition of the house and the lack of appropriate food in the house, and did not place Peggy on notice that her mental health was going to be an issue. We conclude that an allegation that Christian was at risk because of Peggy's "fault" did not sufficiently encompass an assertion that a mental health condition she may have suffered from constituted fault-based conduct on her part requiring adjudication of Christian. We reverse, and remand with directions to dismiss without prejudice.

II. BACKGROUND
The events giving rise to this action occurred in January 2009, when a Douglas County sheriff's deputy was dispatched to Peggy's residence. The officer discovered that the house "was in total disarray." The officer's testimony and photographic evidence received by the court indicate that "the house was just totally cluttered." The officer testified that there was an area in the living room set off with a series of "baby gates," and the photographs reveal that such area generally contained toys and items for Christian, who was at the time approximately 16 months of age. The officer also testified that he did not observe "any baby food in the house or any food that was readily available to a child."
The officer had Peggy transported to a hospital for a mental health observation. Christian was placed in "emergency protective custody" because of a belief that it was not safe for Christian to be in the house. The officer testified that "[d]ue to the conditions of the house" and "due to [Peggy's] mental capacity that day," there was a risk for harm to the child.
On January 2, 2009, a petition was filed seeking to have Christian adjudicated as a child within the meaning of Neb.Rev.Stat. § 43-247(3)(a) (Reissue 2008). The petition specifically alleged that Christian lacked proper parental care through the fault or habits of Peggy and that Christian was at risk of harm. The petition indicated, as factual grounds for the allegations, the filthy condition of the house and the lack of appropriate food for Christian in the house. There was no mention in the petition of Peggy's mental health.
The adjudication hearing was held on March 31 and June 26, 2009. During the course of the hearing, the court received testimony from the officer who responded to Peggy's residence, a caseworker, and a social worker from the hospital who conducted a psychological evaluation of Peggy. More specific details concerning the testimony of these witnesses will be set forth in the discussion section of this opinion, below. As noted more fully below, substantial testimony was provided, over repeated objections of Peggy's counsel, concerning Peggy's mental health and its impact on whether Christian was at risk of harm.
At the conclusion of the adjudication hearing, the juvenile court made a finding on the record that the allegations of the petition were true. The court noted that Peggy's mental health may have contributed to the condition of the house, but also acknowledged that there had been no evidence presented in that regard. On June 30, 2009, the court entered an adjudication order finding the allegations of the petition to be true. This appeal followed.

III. ASSIGNMENTS OF ERROR
Peggy asserts, among her assignments of error, that her due process rights were *42 violated when the juvenile court allowed substantial evidence and testimony concerning her mental health, an issue not raised by the operative petition, and that absent the evidence and testimony concerning her mental health, there was insufficient evidence to support the adjudication order. Because our discussion of these assertions resolves the appeal, we will not further or more specifically address her remaining assignments of error.

IV. ANALYSIS
Peggy asserts that the juvenile court erred in receiving, over objection, testimony concerning Peggy's mental health. Peggy asserts that the operative petition made no mention of her mental health as an issue or a ground for the sought-after adjudication and that allowing her mental health to become a focal point of the adjudication hearing violated her due process rights. She also asserts that, absent the testimony concerning her mental health, there was insufficient evidence to support the adjudication order. We agree.
In the context of both adjudication and termination hearings, procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. In re Interest of Heather R. et al., 269 Neb. 653, 694 N.W.2d 659 (2005); In re Interest of Mainor T. & Estela T., 267 Neb. 232, 674 N.W.2d 442 (2004). An adjudication hearing is the trial stage of a juvenile proceeding, in which the State must prove its allegations in the petition by a preponderance of the evidence. In re Interest of Mainor T. & Estela T., supra. Adjudication is a crucial step in proceedings possibly leading to the termination of parental rights. Id. Parents have a fundamental liberty interest at stake, and the State cannot adjudicate a child except by procedures which meet the requisites of the Due Process Clause. In re Interest of Mainor T. & Estela T., supra.
In this case, the operative petition indicated that the grounds for adjudicating Christian were that the condition of the house and the lack of appropriate food in the house placed him at risk of harm and were the fault of Peggy. As a result, Peggy was on notice that the condition of her house and the appropriateness of food in the house and those items' impact on Christian's well-being would be at issue, and she was on notice to be prepared to defend against those assertions.
A review of the record presented to the juvenile court, however, reveals that the bulk of the evidence presented by the State was concerned with Peggy's mental health, not with the condition of the house, the appropriateness of food available in the house, or either's relationship to Christian's well-being.
The officer who responded to Peggy's house testified about the condition of the house and described it as cluttered. He also testified that he did not observe any baby food in the house. A series of photographs was also received depicting the clutter throughout the house. His testimony, however, did not indicate that Christian was in any danger of harm because of the condition of the house or the food available in the house. Although he testified that Christian was placed in emergency custody, he testified that this was done because of "the conditions of the house ... and due to [Peggy's] mental capacity that day."
*43 The officer did not testify that the child was physically in the cluttered portion of the house or near any dangerous items depicted in the photographs. The testimony of the caseworker, for example, indicated that Christian generally remained in the play area (which the officer testified was set apart from the rest of the house by baby gates) and that the report the caseworker received stated the play area was "clean." One photograph depicts a pair of scissors lying on the floor in the play area, but there was no testimony concerning whether the scissors were sharp and dangerous or safety scissors, and there was no testimony to indicate that the child was ever in the play area at the same time as the scissors. Another photograph depicts an open hunting-style knife somewhere in the house, but there is no testimony concerning where the knife was or whether it was located anywhere that Christian ever had access; the testimony that Christian generally remained in the play area would suggest it was not within his reach.
Additionally, although the officer testified that he did not observe any baby food in the house and even though the petition specifically alleged the lack of appropriate food in the house as a basis for adjudication, there was no testimony offered concerning whether Christian lacked proper nutrition. Indeed, the officer acknowledged on cross-examination that, although he did not observe baby food, he did observe other food in the house and, further, that he did not have children of his own and was unaware of when children stopped using formula or eating baby food. Other than the officer's observation that there was no baby food in the house, there was no other evidence presented concerning food or proper nutrition for Christian.
The caseworker testified at length, over repeated objections, about discussions with Peggy concerning Peggy's mental health problems. She testified that Peggy left her numerous messages concerning "FBI cases," conspiracies, and allegations that neighbors were pointing shotguns at Peggy when she was in her backyard. The caseworker testified that she had an opinion about whether Christian was at risk of harm if returned to Peggy, and she testified that her opinion was based on her "meeting with Peggy, the conversations that [she] held with Peggy, and the voice mails that Peggy has left for" her. On that foundation, the caseworker opined that Christian was at risk of harm. When Peggy's counsel objected that the opinion was being offered on a basis that did not "include anything to do with the allegations... which were the condition of the home," the court overruled the objection and stated that the allegation was that "the child lacks proper parental care."
The caseworker acknowledged that Christian, when taken from Peggy's care, was clean and properly clothed and appeared to be in good health. She testified that there was nothing to indicate a lack of proper nutrition. She also testified concerning the condition of the house and, as noted above, testified that Peggy had indicated that Christian generally remained in the home's play area, which was clean. When the State asked questions on redirect, over objections, they were exclusively concerned with additional testimony about Peggy's mental health status.
Finally, the State adduced testimony from a social worker from the hospital where Peggy was transported after the officer's response to her house. The social worker testified that she provided a psychological evaluation of Peggy. Her testimony, over objections, was exclusively concerning Peggy's mental health status. She testified that she filled out a "Board of Mental Health Petition" concerning Peggy's *44 mental health status. On cross-examination, she acknowledged that Peggy's interactions with Christian were appropriate and that she did not observe any behaviors by Peggy that posed a danger to Christian.
Our review of this record leads us to conclude that the State made Peggy's mental health status a focus of attempting to prove the allegation that Christian was at risk and lacked proper parental care through the fault of Peggy. The allegations of the petition, however, concerned only the condition of the house and the lack of appropriate food in the house, and did not place Peggy on notice that her mental health was going to be an issue. We also note that in In re Interest of Amanda H., 4 Neb.App. 293, 306, 542 N.W.2d 79, 88 (1996), this court indicated that it was "loath to accept any finding of a fact which is based upon the premise that if a person suffers from recognized medical conditions, such as manic depression, major depression, and seizures, then that parent is not going to give his or her children proper care," and we specifically questioned whether "a particular mental condition is the fault of the person suffering from it," such that an allegation concerning the mental health of a parent can properly be based on an assertion that the child lacks proper care through the fault of that parent.
We conclude that Peggy was not properly placed on notice that her mental health would be a basis for seeking to prove the allegation that Christian lacked proper parental care and was at risk of harm through Peggy's fault. This is both because the specific factual allegations made in the petition concerned only the condition of the house and the lack of appropriate food for Christian and did not mention anything concerning Peggy's mental health and because an allegation that Christian was at risk because of Peggy's "fault" did not sufficiently encompass an assertion that a mental health condition she may have suffered from constituted fault-based conduct on her part.
When reviewing the record de novo, we conclude that the remaining evidence in the record was not sufficient to demonstrate that Christian was at risk of harm based on the condition of the house or the lack of appropriate food. The testimony indicates only that Christian had access to the play area depicted in the photographs, which area was not cluttered, filthy, or otherwise in dangerous disarray. There was no evidence that Christian had access to or was in the cluttered and filthy portions of the house depicted in the other photographs. Although the evidence included photographs of both a pair of scissors and an open hunting-style knife, there was no testimony about whether Christian was able to access either, there was no testimony about the scissors and whether they were dangerous and sharp or merely safety scissors, there was no testimony about whether the scissors were present in the play area at any time when Christian was, and there was no testimony about the location of the knife or Christian's access to it. With respect to the food in the house, the only evidence was that although there was no baby food, there was other food, and that Christian did not show any indications of lacking any proper nutrition.
A review of the record in this case makes it clear the State focused on demonstrating that Peggy had an extremely cluttered house and suffered from some mental health issues and that Christian was, accordingly, at risk of harm. The State failed to prove by a preponderance of the evidence that Christian was at risk or lacked proper parental care through Peggy's fault. We therefore direct that the juvenile court dismiss the proceedings, but *45 that such dismissal shall be without prejudice to any new proceedings if the facts at the time of the filing of new proceedings justify such proceedings and if the allegations properly provide Peggy with due process.
REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS.